## Yorke *v.* Lee, Appellant.

Argued September 30, 1952. Before RHODES, P. J., HIRT, RENO, DITHRICH, ROSS, ARNOLD and GUNTHER, JJ.

*Thomas I. Guerin,* for appellant.

*Foster A. Dunlap,* with him *Philip S. Polis,* for appellee.

OPINION BY ROSS, J., January 20, 1953:

The complaint in this action of assumpsit brought by Erma C. Yorke alleged in substance that the defendant, Fred Lee, "forced" plaintiff to "give" him the sum of $100 a month from June 1, 1944 to December 1, 1945 "because of threats of bodily harm and personal violence and other illegal threats made to her by him." It was further alleged that "at Christmas 1945" defendant "obtained" $200 "using similar threats". Finally it was alleged that from March 1946 to December 1946 defendant "compelled" plaintiff to "give" him additional sums of money totalling $1450 "by the use of threats similar to those described . . . above". An answer was filed denying the allegations of the complaint. The case was tried before a jury which returned a verdict for the plaintiff in the sum of $800, and after the defendant's motion for a new trial was refused, he took this appeal.

The evidence adduced by the plaintiff to support the allegations of her complaint may be summarized as follows: She was married to William Lee Yorke, a Chinese, who, until his death on May 15, 1944, owned and operated a Chinese restaurant in Philadelphia, where the defendant worked as a waiter and cook from May 1943 until the restaurant was temporarily closed on December 2, 1945.

Plaintiff testified that after her husband's death and the closing of the restaurant she went to New

York where she met with the defendant and three other Chinese. At this time, according to plaintiff, "they" told her she "would have to send $100.00 a month to China for relief if I wanted to open the restaurant doors". She agreed to send the $100 a month and stated that in doing so she merely intended to continue systematic donations made voluntarily by her husband in his lifetime. She testified that after her return to Philadelphia "a couple of days before Decoration Day" 1944, the defendant "came upstairs and said that I would have to give him $100.00 a month besides the $100 I was giving to the Chinese relief". She stated: "He said I was to pay it. He said that I could not open up if I did not give it to him". She consulted her attorney with respect to this alleged demand but his advice to her does not appear. Thereafter defendant told her he would "make me a lot of trouble if I did not pay him the money". Plaintiff stated that she made one payment of $100 to defendant in June of 1944 but in July of that year she did not pay the money and defendant "took it off the waiters' and waitresses' money". Around Labor Day of 1944 plaintiff and defendant "had a big fuss" about the $100 payments and at that time defendant and one Paul Wung stated that if she did not make the payments to defendant they "would say that Mr. Yorke had a wife in China when he was nine years old". Plaintiff testified that she considered this matter "ridiculous" and that she "laughed it off" because she knew and could prove that her husband had been in the United States when he was nine years old, but that she nevertheless consulted her attorney and that he advised her to pay the money to defendant.

It would appear that plaintiff paid the defendant $100 in June of 1944, as noted above, and between that time and December of 1945 permitted him to with-

hold $1800 from the money which he as cook and un-official manager of the restaurant collected from the waiters and waitresses. Plaintiff—presumably by way of attempting to explain why she failed to make any attempt to halt defendant's practice of withholding restaurant receipts—stated that she feared defendant because in July of 1945 he persuaded the "Yak-a-mein Company" to discontinue sale of "noodles" to her for her restaurant and because he "laid off my head cook who had been there for over seven years". She testified further that certain restaurant equipment "went bad", that the skylight was "pushed in by somebody", and that the "cellar door was open at night". There was no evidence to connect defendant with any of these alleged mishaps.

With respect to the $200 which defendant is alleged to have "obtained" from plaintiff at Christmastime of 1945, she testified that "at Christmas of 1945 he [defendant] came in and said that I had to give him $200.00. When I told him no, he went to hit me. He pushed me." When asked if she then gave him the money, she replied, "After a lot of argument, I gave it to him. I gave it to him after talking to Mr. Sowers", her attorney.

Finally, plaintiff gave testimony intended to support her allegation that defendant compelled her to give him various sums of money in 1946 and 1947 by the use of "threats of bodily harm and personal violence and other illegal threats". Plaintiff leased her restaurant to defendant and one Henry Hoesie for a term of three years commencing March 1, 1946. Plaintiff testified that she made this lease because defendant "scared" one Martin Chang "and another fellow", prospective lessees, by stating to them that there would be a "tong war" if plaintiff leased to them. The rental was $325 for the premises and an additional $175 for

fixtures. Plaintiff complained that the defendant held out $175 a month on the rent for eight months of 1946 and that in 1947 he held out $175 for six months and $200 a month for two months. When she demanded payment of the full $500 a month rent the defendant, according to plaintiff, stated that he would not give her the full rental and that he was sending the money withheld to China. He refused plaintiff's offer to send it to China for him. In summary, plaintiff stated that defendant failed to pay $1400 of the rent in 1946 and $1450 in 1947. It appeared that the defendant and Hoesie had given plaintiff $2000 as security for faithful performance of the terms of the lease, and plaintiff stated that she had the deposit at the time of the trial and was aware that she was not obligated to return it if the lessees did not pay rent.

In our opinion, there is in the present case a material variance between the allegata and probata. The defendant properly raised the issue by objecting when the testimony not covered by the complaint was offered and by moving for a nonsuit, assigning the divergence as the reason. *Kehres v. Stuempfle*, 288 Pa. 534, 136 A. 794. The plaintiff had an opportunity to amend when the question of variance was raised, and since she chose not to do so, she is bound by the rule that allegata and probata must be in agreement. *Higgins Lumber Co. v. Marucca*, 159 Pa. Superior Ct. 405, 48 A. 2d 48; *McDonough v. Munhall Borough*, 331 Pa. 468, 200 A. 638.

It is to be recalled that the complaint alleged that the defendant "compelled" plaintiff to "give" him various sums of money at different times by the use of "threats of bodily harm and personal violence and other illegal threats". The proof clearly at variance with this allegation is that with respect to the withholding of a part of the restaurant rent by defendant

and his co-tenant, Henry Hoesie. Certainly this was not money which defendant "compelled" plaintiff to "give" him and there is not a scintilla of evidence that a "threat" of any kind was made in connection with defendant's alleged failure to pay the full amount of rent. The payments of $100, only one of which was *given* to defendant by plaintiff, stand upon slightly different ground. Here the alleged threat was that if the payments were not made plaintiff could not open her restaurant. The variance in this instance lies in the fact that there is nothing in the record to support a conclusion that this "threat"—if, indeed, the statement attributed to defendant by plaintiff may be characterized as such—was "illegal". Standing alone, as it does in this record, defendant's statement that plaintiff could not open the restaurant unless she paid him $100 a month, may have been intended as a warning to plaintiff that she, a Caucasian, could not successfully operate a Chinese restaurant without his help. Also in connection with the $100 payments was the "threat" by defendant and another to say that Mr. Yorke had married in China when he was nine years old. Obviously this threat did not induce plaintiff to give defendant any money because she considered it ridiculous. Finally, there is the allegation with respect to the sum of $200 which the plaintiff testified she gave defendant at Christmastime in 1945. In support of this allegation plaintiff testified that defendant "went to hit" her and pushed her. It is clear, however, that the defendant's acts had nothing to do with the payment of the money if such payment was made. Plaintiff, by her own admission, did not give the defendant the money until after she had discussed the matter with her attorney.

The following language from the opinion of the Supreme Court in *Aland v. P-G Publishing Co.,* 337 Pa.

259, 262, 10 A. 2d 5, is applicable to the present case: "Defendant was . . . confronted at the trial with an elaborate and confusing narration as a basis for a claim which was entirely foreign to that set forth in the pleadings. It could have had no intimation thereof from the allegations of the statement. Despite the increasing informality of modern practice, there has been no substantial departure from the salutary rule that pleadings and proof must conform sufficiently to enable a defendant to meet at trial the same cause of action disclosed by the statement of claim."

Here the defendant went to trial on a complaint that he *by threats* had compelled the plaintiff to *pay* to him certain sums of money at certain times. The proof submitted by the plaintiff in support of her claim varied greatly and materially from the allegations of the claim. The defendant promptly and properly raised the question of variance between the allegata and probata and the plaintiff thus had her opportunity to amend but did not do so. Consequently, the defendant's motion for a retrial of the case should prevail, and this being our conclusion, it is not necessary to discuss the other contentions—scope of the cross-examination of defendant and charge of the court—advanced by the defendant in support of his motion for a new trial.

Judgment reversed and new trial awarded.